UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

SHARMAINE WILSON,               )
                                )
        Plaintiff,              )    Civil No. 5:17-cv-00-73-JMH
                                )
V.                              )
                                )
PEARL INTERACTIVE NETWORK,      )    **MEMORANDUM OPINION & ORDER**
INCORPORATED,                   )
                                )
        Defendant.              )

*** *** *** ***

This matter is before the court upon Defendant's Motion for
Summary Judgment [DE 25]. Plaintiff has responded, stating her
objections [DE 35], and Defendant has filed a Reply [DE 40] in
further support of its Motion.  For the reasons which follow, the
Court concludes that summary judgment is appropriate and that the
motion shall be granted.

**I.**

Pearl Interactive Network, Incorporated ("Pearl"), opened a
contact care center, or call center, in Winchester, Kentucky in
the Summer of 2013. In Winchester, Pearl specializes in answering
customer service questions from individuals and small businesses
related to insurance plans available through the Affordable Care
Act. Peak season correlates with open enrollment under the
Affordable Care Act. Pearl performs this business pursuant to a

1

series of contracts where the federal government is the ultimate client. The Center for Medicare and Medicaid contracted with General Dynamics Information Technology ("GDIT") for GDIT to help administer customer service related to health insurance plans, and in turn, GDIT subcontracted with Pearl for Pearl to perform a portion of the call center business for those plans.

Pearl hired Plaintiff Wilson as a seasonal customer service representative ("CSR") on September 15, 2014, on an at-will basis. Wilson was one of 19 seasonal employees selected on December 31, 2014, to transition to a full-time CSR position.

Plaintiff did well in her new role. In February 2015, Kirk Winiarczyk, Wilson's direct supervisor, nominated her for "Rookie of the Month." Wilson won that award and was featured in Pearl's newsletter for the award, perfect attendance, and for winning the second-round quality and average handle time contest. The newsletter described Wilson as an "excellent employee and outstanding worker."

Advancement was available to Pearl employees. Open supervisor positions were only posted internally in an effort to allow existing CSRs to advance their careers with Pearl. In addition, CSRs were offered opportunities to learn skills needed to promote to supervisor. This included: nesting, floor walking, acting as

drivers for training classes, and being an acting supervisor.[1] Wilson was identified as someone who desired advancement at Pearl. In addition to her regular job duties, she assisted as a "floor walker" and a peer mentor during nesting.

During the time that Wilson was a full-time permanent CSR, Pearl posted internally for one supervisor position, on April 9, 2015. Winiarczyk forwarded the posting information to several of his team members, including Wilson, encouraging them to apply.[2] The position announcement stated a preference for candidates with a bachelor's degree or equivalent work experience and required 6 months supervisory or leadership experience, a minimum of two years customer service experience, and leadership and team interaction skills.

Wilson applied for the position on April 12, 2015, and was interviewed after initial screening, along with 19 other existing Pearl CSRs. Several of the CSRs, unlike Wilson, were being interviewed for the second time. Co-operations managers Jason Howard and Tony Listermann conducted the interviews together. A

---

[1] Nesting is the time period after initial CSR training where an existing CSR sits with the new CSR while they take calls. Floor walkers are CSRs that walk the floor and help respond to CSR questions, and drivers are CSRs who assist during initial training classes for CSRs. Acting supervisors have the opportunity to supervise a team.

[2] Winiarczyk offered his team members, including Wilson, tips on interviewing and trained them on supervisor duties, such as printing computer reports.

set of interview questions was developed and used during each interview for consistency. Howard and Listermann took contemporaneous notes for each interviewee. Immediately following each interview, they ranked the candidate on a spreadsheet.

Wilson was the least tenured candidate, and it was her first time applying for a supervisor position. She had no "acting supervisor" experience and had not yet been a driver. Wilson represented in her cover letter that she had three years of work experience in call centers, although she had actually worked only for Pearl and its subcontractor for 8 months and had an additional five months of call center experience with two other employers over the course of three years. Wilson had no supervisory experience in those call centers or with other employers, even though she had served as a college intern at a women's shelter and led counseling sessions as she worked on her degree in social work. At the time of the interview, based on objective performance benchmarks, Pearl ranked Plaintiff 91st among its CSRs.

Both Howard and Listermann had concerns about Wilson's interview consistent with their interview notes. Both believed she could benefit from additional call center experience, either as a driver or acting supervisor with Pearl (neither opportunity had been offered to her at the time of the interview) and had concerns about her ability to work with others based on her responses during

the interview.[3] Howard and Listermann came to a consensus to offer the position to Deserae Hale, a white female, and Human Resources signed off on the decision. Hale was the highest ranked candidate after the interviews. Her selection was announced on May 22, 2015.

Hale had been a Pearl CSR since August of 2013 and had previously applied for the supervisor position. She had experience as a driver and acting supervisor for Pearl. While she had only fourteen (14) days of acting supervisory experience with Pearl and no college degree, she had four years prior experience supervising a team of employees in the restaurant industry, and almost three years working at Pearl and other call centers.

Neither call center nor leadership experience were specifically listed as factors on the spreadsheet used by Howard and Listermann, nor did Hale's higher CSR ranking did not factor into the decision to promote her. On the spreadsheet, Wilson scored a "1" with respect to integrity and trust (Hale received a "3") and lacked training driver or acting supervisor experience at Pearl (Hale received a "3" while Wilson received a "0"), leadership

---

[3] Specifically, Listermann noted that she criticized another supervisor during the interview and indicated that she did not follow "stupid policies". Wilson acknowledges that the ability to work with others is a legitimate consideration in hiring for a supervisor position, but she denies that she made the statements as they are ascribed to her. Accordingly, the Court will not consider them in its analysis on this motion for summary judgment.

By contrast, the Court accepts as true what Wilson recalls but Howard denies, that Howard exclaimed during the interview, "we're crazy if we don't pick you for this position," although the Court is not persuaded it is material to the question at hand.

skills (Hale received a "3" while Wilson received a "2"), and "interview ranking" (Hale received a "5" while Wilson received a "2"), which the Court understands to mean Howard and Listermann's subjective evaluation of a candidate's performance during the interview relative to the other candidates. With respect to these scores, Howard and Listermann routinely reassessed the relative scores of those in the highest positions on their spreadsheet as more interviews took place in order to determine who was the best candidate performance-wise and should be promoted to supervisor.

After Hale received the promotion, Wilson discussed the supervisor position with Betty Pennington, who was the only African-American supervisor at the facility at that time. Pennington confided in Wilson that she believed that Pearl discriminated against African-American and other minority employees. At some point, Wilson emailed Rutten, the onsite Human Resource representative to request a meeting so that she could review a copy of the affirmative action plan. Rutten did not reply. On May 27 and 28, Wilson made several attempts to find Rutten in her office. Rutten did not contact Wilson during this time. Finally, on May 28, 2015, Wilson spoke to Bruce Koenig about Pearl's affirmative action policy. Koenig worked for Pearl's contractor, GDIT, and his office was situated next to Rutten's office. After Koenig acknowledged to Wilson that Pearl was to

have an affirmative action policy as a federal subcontractor, Wilson returned to work.

Within a couple of hours of speaking to Koenig, Wilson's employment was terminated. Pearl's records indicate that Wilson was terminated for timecard fraud. Timecard fraud was an important issue for Pearl as a federal subcontractor, and all CSRs are trained during orientation regarding the importance of accurate timekeeping and logging on and off their phone for lunch and breaks. CSRs enter their time in Pearl's electronic timekeeping system and verify its accuracy. Wilson understood that it was a violation of Pearl's policy to falsify a time sheet.

All CSRs are assigned "Skill Building Activities" or "SBA time." The training is assigned through Empower which provides each CSR an exact schedule to follow each day. During SBA time, CSRs put their phones into an auxiliary mode so that they do not receive incoming calls and can then complete mandatory training. CSRs are not permitted to leave their desks during SBA time, but rather must complete the required training. If the assigned training is completed, CSRs move on to additional available on-line training. In addition to the SBA Policy, information about SBA time was communicated to all staff via email on June 11, 2014, and at other times. Wilson's supervisor also testified that he

instructed his team, including Wilson, not to leave their desks during SBA time.

On May 15, 2015, Winiarczyk was off work for the day. Cora Jordan, a Pearl trainer, reported to LaVonne Rutten, the then on-site human resource representative, that she had observed Wilson away from her desk and repeatedly badging in and out of the facility during assigned Skill Building Activity ("SBA") time. Rutten informed Listermann, who was by then the Contact Center Manager, of Jordan's report, and Listermann was asked to investigate further. He requested a badge report for Wilson from the third party that maintains the records for that day in question.[4] *Id.* at 135. Listermann further consulted other supervisors to see if anyone had given Wilson permission to leave her desk on that day and was told no. Listermann received the badge report on May 27, 2015, and forwarded it to Human Resource Manager Sonya Smith that day along with the corresponding time card for May 15, 2015. A review of Wilson's activities on that day compared to her time record shows that Wilson was away from her desk during SBA time, did not clock out, and then submitted her

---

[4] All employees must badge in twice before entering the secure floor where they work. The first badge swipe shows when the employee enters the building and the second badge swipe shows when they entered the secure floor where they work. This is a strict policy as CSRs have routine access to sensitive medical and personal information about callers.

time for payment as time worked. Wilson does not present evidence to counter this, and the Court accepts it as true.

Based on this information, Listermann recommended Wilson's employment be terminated. Smith signed off on the decision to terminate Wilson's employment via electronic communications as early as 8:51 a.m. on May 28, 2015, both to Listermann and Rutten. Thus, the decision had been made before she ever arrived at work on May 28. The email was signed and delivered at 8:51 a.m. Wilson did not clock in until 9:15 a.m. and could not have reached out to Koenig until sometime after that. Listermann and Rutten met with Wilson after lunch on May 28, 2015, and informed her that her employment was terminated due to time fraud. Listermann had no knowledge of Wilson's communication with Koenig at the time he terminated Wilson's employment. Although Wilson theorizes that Koenig told someone at Pearl about the conversation, there is no evidence to suggest that he did.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the burden is on the moving party to conclusively show no genuine issue of material fact exists. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court

must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson,* 477 U.S. at 250. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor

of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy. Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.

In the absence of direct evidence,[5] Wilson must establish discrimination under either federal or state law using circumstantial evidence and the *McDonald Douglas* burden-shifting approach.[6] *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 391 (6th Cir. 2008); *Williams v. Wal–Mart Stores, Inc.,* 184 S.W.3d 492, 495 (Ky. 2005). Wilson must first demonstrate a prima face case of discrimination in promotion by showing that (1) she is a member of a protected class; (2) she applied and was qualified for a promotion; (3) she was considered for and denied the promotion;

---

[5] Wilson testified that "I always felt really – everybody was really nice to me, and I was advancing really fast. I never felt any of those racial problems . . ." Meanwhile, she testified that three African-American Pearl employees told her that Pearl was "racist" or would not promote an African-American; yet, no one offered her any specific reasons why they felt this way. She later clarified, explaining that she believed that race played a role in her not receiving a promotion because she was more qualified than Hale, the person hired for the supervisor position.

[6] Kentucky courts look to federal law in interpreting the Kentucky Civil Rights Act. *Woodrum v. Lane Bryant The Limited, Inc.,* 964 F.Supp. 243, 244 (W.D.Ky. 1997). "The Kentucky Civil Rights Act was modeled after federal law, and our courts have interpreted the Kentucky Act consistently therewith." *Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky. 2003). Specifically, the Kentucky Supreme Court has interpreted the KCRA's provisions in a manner consistent with federal precedent of Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e-2(a). *See Williams v. Wal–Mart Stores, Inc.,* 184 S.W.3d 492, 495 (Ky. 2005); *Ammerman v. Bd. of Educ. of Nicholas County,* 30 S.W.3d 793, 797-98 (Ky. 2000). The provisions of Title VII mirroring KRS § 344.040(1) have been interpreted by the Supreme Court of the United States to prohibit both intentional discrimination, as well as employment practices that have a disproportionately adverse effect on minorities. *See Ricci v. DeStefano,* 557 U.S. 557, 577 (2009).

and (4) other employees of similar qualifications who were not members of the protected class received promotion." *Johnson v. Box USA Group, Inc.,* 208 F.Supp.2d 737, 740 (W.D. Ky. 2002), *citing Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1020-21 (6th Cir. 2000). "The prima facie requirement for making a Title VII claim 'is not onerous,'...and poses 'a burden easily met...'" *Cline v. Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 1999) (internal citations and quotations omitted), citing *Burdine*, 450 U.S. at 253 and *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).

The first three elements of Wilson's prima facie case are not in dispute.  It is also undisputed that an individual who was not a member of the protected class occupied by Wilson received the promotion.  Defendant argues, however, that Wilson's claim fails because Wilson did not have similar qualifications, i.e., she was not objectively as or better qualified for the position than the person selected.  *See White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 243 (6th Cir. 2005) ("As the district court notes, a true comparison of White's qualifications with those of Walker reveals that White is not as qualified as Walker for the position, and therefore, White fails to meet the fourth prong of her prima facie burden."). Of course, Wilson "is not required to establish that she and [Hale] had the exact same qualifications. Requiring a plaintiff to show identical qualifications to another

individual is not realistic from a human standpoint. . . . Instead, what is required in a failure to promote case is for the plaintiff to show she possesses 'similar qualifications' to the employee who received the promotion." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011).

In this instance, the undisputed facts show that while Hale and Wilson were not entirely dissimilar candidates, Hale had several distinctly different, relevant qualifications for the position that Wilson did not. Hale had worked for four years as a shift manager at Burger King, from August 1998 to November 2002, during which time she participated in both hiring and termination processes and worked directly with upper level management. Hale had worked for Pearl for a little over a year and a half at the time of the interview, since August 23, 2013, and had served as both a driver and acting supervisor at Pearl's call center. She had previously worked at another call center, ACS, from October 2009-January 2010 performing customer service. Wilson had never supervised employees, although she had interned as a counselor while seeking a degree. She had no experience hiring, firing or disciplining employees. The fact that she had a master's degree in social work did not make her more objectively qualified than Hale for a position that included a preference for but did not require a bachelor's degree. In this sense, the case is somewhat

distinguishable from *Provenzano*, upon which Wilson urges the Court to rely. 663 F.3d at 814 (concluding that a reasonable trier of fact could conclude that plaintiff was similarly qualified to the promoted employee for the purposes of the prima facie case, despite differences, because plaintiff "had been a supervisor longer, had helped in other stores, and held a high school diploma and associate's degree" while promoted employee had "a stronger performance record, without any written or verbal warnings in comparison to [plaintiff's] multiple counselings").

For this reason, the Court could conclude that Wilson's subjective belief that she was more qualified than Hale "is in essence mere disagreement with the corporation's business judgment, and does not create an issue of fact." *Johnson,* 208 F.Supp.2d at 742, *citing Grauer v. Federal Express Corp.*, 894 F.Supp. 330, 334 (W.D.Tenn. 1994), *aff'd,* 73 F.3d 361 (6th Cir. 1996); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (employer has greater flexibility in choosing managerial level employees). Then, there would be no reason to engage in the remainder of the burden shifting analysis. *Burdine*, 450 U.S. at 253 (; *McDonnell Douglas*, 411 U.S. at 802). However, recognizing the relatively low hurdle of the prima facie case and on the facts before it, the Court concludes that Plaintiff's failure to promote claim cannot succeed because, even if she could meet her prima facie burden, Pearl provides a legitimate discriminatory reason for not

promoting Plaintiff to the supervisor position. Further, Wilson has not presented facts from which the trier of fact could conclude that the stated reason for the decision to promote Hale and not Wilson was actually pretext for discrimination.

Assuming arguendo Wilson established a prima facie case, the burden would then shift to the employer to articulate a legitimate nondiscriminatory reason for failing to promote the plaintiff to the position sought. *Burdine,* 450 U.S. at 254; *White,* 429 F.3d at 244. Pearl is not required to persuade the court that it was actually motivated by the proffered reasons. *Burdine,* 450 U.S. at 254. Rather, it is sufficient for Pearl to raise a genuine issue of fact as to whether it discriminated against Wilson. *Id.* In order to accomplish this, Pearl must clearly set forth, through the introduction of admissible evidence, its reasons for not promoting Wilson. *Id.* at 255.

The Court turns to Howard and Listermann's opinions of Wilson and Hale. They assert and their spreadsheet prepared during the hiring process reflects that they sought a candidate with supervisory and call center experience, specifically one who had introductory supervisory opportunities as a driver and acting supervisor with Pearl before promotion. Plaintiff concedes that this is a legitimate non-discriminatory reason for Defendant's decision not to promote Wilson. The Court concludes that Pearl has

met its burden of production at this second stage of the *McDonnell Douglas* analysis. *See Provenzano,* 663 F.3d at 814–15 (holding that defendant met its burden where defendant gave a detailed description of performance-related attributes for the promoted individual and the plaintiff's performance-related deficiencies).

The burden has now shifted back to Wilson to show why this reason was a pretext for discrimination. "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Pretext can be shown by offering evidence that the employer's stated reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). The "analysis of the pretextual nature of the proffered justifications for [an] employment decision again must be overlaid with an understanding of the summary-judgment principles at play. In other words, at this preliminary stage of the litigation, [plaintiff] need only identify genuine disputes of fact regarding the legitimacy of the defendant's stated reasons in order to withstand a motion for summary judgment." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015).

"To evaluate whether a plaintiff has created a genuine issue of material fact that the defendant's proffered non-discriminatory reason did not actually motivate the defendant's challenged conduct, we examine the evidence the plaintiff produces to establish a prima facie case, evidence discrediting the defendant's proffered reason, as well as any additional evidence the plaintiff chooses to put forth." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007). "[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Id.*

Ultimately, the evidence does not support Plaintiff's argument that Defendant's articulated reasons for failing to promote Wilson were pretextual and actually motivated by discrimination. Defendant explains that Hale was more qualified than Wilson because 1) she was ranked higher as a CSR; 2) had significantly more seniority with Pearl; 3) had previously applied for the position; 4) had more experience working in call centers; 5) had previously worked as a supervisor of a team of employees; and 6) had been both a driver and acting supervisor. (Def. MSJ, p. 13-14).

The CSR scorecard ranking did not factor into the decision, as Listermann testified, but it is true that Hale had significantly more seniority within the company than Wilson and had applied for

the position previously. Accepting that seniority and prior supervisory experience could not have supported Defendant's decision because they are not listed in the job qualifications, the spreadsheet used to rank candidates, or as part of the form interview questions, these factors are still relevant to the candidates' call center experience at Pearl. Even though call center experience was not specifically listed as a factor in the spreadsheet, the experience at Pearl goes to Defendant's sixth reason – citing the fact that Hale had previously worked as a driver and acting supervisor at Pearl, while Wilson had not. Assuming that only the fact that Hale had been both a driver and acting supervisor at Pearl is relevant, Plaintiff's claim would fail at this stage of the analysis if the Court considers the reasons articulated in the spreadsheet as the basis for Defendant's decision. Wilson did not have this experience because it had not been offered to her at the time of the interview, but she had not been at Pearl for nearly as long as Hale.

Plaintiff argues that an assessment of how her interview went, the final category on the spreadsheet, is not objective and could mean that the company picks who it wants, not who is most objectively qualified. Even assuming that to be true, it does not mean that Pearl picks who it wants based on a discriminatory purpose. Nor is the Court persuaded that this is so because the interviewers would regularly change the numbers on the spreadsheet

to move candidates further up or down on the list. The fact that the interviewers constantly recalibrated their assessments of the applicants as the interviews progressed is not, without more, a demonstration of a discriminatory motive. Finally, Plaintiff quibbles that a jury could disbelieve Pearl's assertion that it had a legitimate, nondiscriminatory reason for not promoting Wilson because she "could benefit from additional experience at Pearl before [sic] promoting to supervisor" (Def. MSJ, p. 15) when Howard's note on a feedback form stated that Wilson would benefit from more call center experience overall, not just experience at Pearl. The Court is not persuaded.

The Court accepts that Wilson had "demonstrated leadership skills" and was "always willing to help with mentoring," qualities for which she was praised in a company newsletter, that she did not have any disciplinary record arising out of an ability to get along with others or for anything else; and that her supervisor had no problems with her. Giving Wilson the benefit of the facts, there is evidence to suggest that she was a desirable candidate for a supervisor position but not the right candidate to promote at the time in question because another candidate had more in-house experience with relevant leadership roles. Perhaps this is only because Hale had been employed with Defendant for a longer period of time than Carter, but that makes Defendant's decision no less valid.

"Courts have recognized that in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain. . .thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage," *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004). In this instance, the Court has examined the evidence for "[p]roof that the defendant's explanation is unworthy of credence," as Plaintiff suggests, and the argument comes up short. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). The employer's justification, having to do with experience over time, has not been eliminated and is undisputed, no matter how much Wilson may seek to minimize it. Thus, there is not a question for the jury as to whether discrimination is the most likely alternative explanation in the absence of something else. *See id.* at 147; *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

## VII.

Both Title VII and KRS Chapter 344 prohibit employers from taking adverse actions against employees who, in good faith, complain of or oppose unlawful practices under each Act. 42 U.S.C § 2000e -3(a); KRS 344.280. In order to establish a prima facie case of retaliation, a plaintiff need only establish that: (1) the plaintiff engaged in activity protected by Title VII, (2) the

defendant had knowledge of the exercise of the plaintiff's civil rights, (3) the defendant subjected the plaintiff to an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. *Singfield*, 389 F.3d at 563 (citations omitted). For purposes of Title VII and KCRA retaliation claims, informal complaints constitute protected activity. *See e.g., Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793 (S.D. Ohio 1998); *Wilson v. Wayne County*, 856 F. Supp. 1254, 1260-61 (M.D. Tenn. 1994); *Coleman v. Wayne State Univ.*, 664 F. Supp. 1082, 1092, n. 5 (E.D. Mich. 1987). Asking Koenig, an employee of another corporation, if Pearl had an affirmative action plan does not constitute a grievance or complaint to Defendant. On the facts before the Court, Wilson acknowledges that, "as a matter of law, she cannot prove retaliation by the Defendant."[7] (DE 35, Response at 27). This is particularly true where the decision to terminate Wilson had been made even before she asked Koenig if Pearl had an affirmative action plan. Accordingly, this claim will be dismissed without further analysis in this Memorandum Opinion and Order.

---

[7] For that matter, if Plaintiff had succeeded in asking the question to Rutter directly or even asked her for a copy of the plan, the Court is not persuaded that alone would constitute a grievance or complaint. Nor is it enough that Wilson set out to learn about the affirmative action plan while, simultaneously, Defendant's management was engaged in a discussion of diversity in promotion practices due to concerns raised by employees about perceived inequities in promotion practices.

## VIII.

For all of the reasons stated above, the Court concludes that Plaintiff's claims fail as a matter of law on the facts before the Court and should be dismissed.

Accordingly, Defendant's Motion for Summary Judgment [DE 25] is **GRANTED.**

This the 23rd day of April, 2018.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge